AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

United States Courts Southern District of Texas
FILED
April 21, 2021
Nathan Ochsner, Clerk of Court

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Vinh Quang Phan | ) | Case No. **4:21mj0867** |
| Diana Le Phan | ) | |
| Nhiem Thi Dan Nguyen | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **December 1, 2019 - April 21, 2021** in the county of **Harris** in the **Southern** District of **Texas**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 371 and 1960(a) | Defendants did knowingly conspire with each other, and with others known and unknown, to commit the following offense against the United States, to wit: to knowingly conduct, control, manage, supervise, direct and own all or part of an unlicensed money transmitting business, which affected interstate and foreign commerce in any manner and degree, in violation of Title 18, United States Code, Section 1960(a). |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Luis Reyna, IRS-CI
Printed name and title

Sworn to and signed telephonically

Date: 04/21/2021

_____
Judge's signature

City and state: Houston, Texas

Peter Bray, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT OF PROBABLE CAUSE

I, Special Agent Luis Reyna, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint charging VINH Quang Phan, DIANA Le Phan, and Nhiem Thi Dan NGUYEN with violation of 18 U.S.C. § 371, conspiracy to conduct, control, manage, supervise, direct, and own an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960.

2. Since 2005, I have been employed as a Special Agent of Internal Revenue Service Criminal Investigation (IRS-CI). My responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Laws (Title 31, United States Code), the Money Laundering Laws (Title 18, United States Code), and related offenses.

3. As a Special Agent of IRS-CI, I received extensive basic training at the Federal Law Enforcement Training Centers (FLETC) in Glynco, Georgia. This training covered all aspects of financial investigations. I have attended continuing professional education classes covering various aspects of financial investigations, including money laundering and asset forfeiture.

4. This affidavit is intended to show only that there is sufficient probable cause for the complaint and does not set forth all my knowledge about this matter.

## APPLICABLE LAW GOVERNING MONEY TRANSMITTING BUSINESSES

5. Title U.S.C. § 1960 makes it a crime to conduct, control, manage, supervise, direct, or own a money transmitting business:

   a. Without a state license if that is a crime in the state (18 U.S.C § 1960 (b)(1)(A)); or

   b. While failing to register with FinCEN in accordance with 31 U.S.C. § 5330 (18 U.S.C § 1960(b)(1)(B)); or

   c. While transmitting or transporting funds known to be derived from a criminal offense or with the intention to promote unlawful activity (18 U.S.C § 1960(b)(1)(C)).

6. Title 18 U.S.C. § 1960(2) defines "money transmitting" to include transferring funds on behalf of the public by any and all means, including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

7. The Texas Finance Code, §§ 151.001 *et seq.*, requires anyone engaged in the business of money transmission services to be licensed by the Texas Department of Banking. "Money transmission" is defined by the Texas Finance Code as "the receipt of money or monetary value by any means in exchange for a promise to make the money or monetary value available at a later time or different location." Tex. Fin. Code § 151.301(b)(4). Operation of a money

transmission business without a license is a felony offense. Tex. Fin. Code § 151.708.

8. Title 31 U.S.C. § 5330(d)(1), which creates the FinCEN registration requirements, defines a Money Transmitting Business as any business other than the U.S. Postal Service that:

    a. provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfers system or any network of people who engage as a business in facilitating the transfer of money of domestically or internationally outside the conventional financial institutions systems;

    b. is required to file currency transactions reports under 31 U.S.C. § 5313; and

    c. is not a depository institution.

**STATEMENT OF PROBABLE CAUSE**

**A.    Overview of Unlicensed MSB**

9. The facts in this affidavit will show that VINH Quang Phan and DIANA Le Phan operate a for profit Unlicensed Money Transmitting business from their home residence located in Houston, Texas. VINH and DIANA have multiple co-conspirators, including Nhiem Thi Dan NGUYEN, who supervises actions taken on behalf of the business by numerous other individuals in the Dallas-Fort Worth metroplex area.

10. The PHANs' Unlicensed Money Services Business (PHAN MSB) has been in operation since at least 2019.

*1.    2019*

11. In 2019, the PHAN MSB received bulk cash (U.S. currency) from customers in Florida and Texas and delivered the bulk cash to customers in California.

12. A cooperating defendant in this investigation ("Cooperator #1")[1] told agents that he/she was a former customer of the PHAN MSB. Cooperator #1 stated that he/she had previously been involved in a drug trafficking operation with a business partner located in California. The

---

[1] In 2020, Cooperator #1 was arrested and indicted for federal narcotics violations in the Northern District of Florida, Panama City Division. Cooperator #1 recently pleaded guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance (Fentanyl, Hydrocodone, and Marijuana) in violation of 21 U.S.C. § 846 and began debriefing with agents.

marijuana was grown by the business partner in California and sent to and distributed by Cooperator #1 in Florida. Cooperator #1 stated that the business partner instructed Cooperator #1 to give proceeds of drug sales to DIANA, a person known to Cooperator #1 only as "Diem" but identified as DIANA through her phone number and a business card she gave to Cooperator #1. Cooperator #1 was told by the business partner that DIANA would make sure that the drug proceeds got to the business partner in California.

13. Cooperator #1 told agents that he/she gave $100,000 in bulk cash to DIANA at a coffee shop in or near Houston, Texas, in December 2019.

14. Cooperator #1 told agents that the PHAN MSB retains approximately 2% of the funds that it transmits.

15. Cooperator #1 has had no contact with DIANA since January 2020, when Cooperator #1 was stopped along I-10 in Louisiana while driving $125,870 bulk cash from Florida to Houston, Texas, for delivery to DIANA. Law enforcement seized the $125,870 bulk cash being transported by Cooperator #1. During and shortly after this traffic stop, Cooperator #1 attempted to talk to DIANA, but she would not take or return the phone calls.

16. VINH and DIANA's credit card records show that, from at least May 2019 through October 2019, they frequently made travel-related purchases along the I-10 corridor linking Texas and California. Additionally, VINH rented vehicles every month between at least June 2019 through March 2020. Two rentals in August 2019 and September 2019 were for multi-week periods. When those two vehicles were returned to the car rental company, their odometers showed approximately 17,000 miles driven during the rental period.

17. That VINH and DIANA traveled with large amounts of bulk cash is indicated by social media posts dated September 4, 2019, using the account "Vinh Diana Phan". One post that day depicted the PHANs experiencing car trouble and being assisted by someone who appears to be a state trooper, and another post depicted banded stacks of bulk cash and a money counter.

18. Additionally, on October 18, 2019, VINH and DIANA reported being robbed at gunpoint at a gas station in Junction, Texas. Junction is 115 miles west of San Antonio, along the I-10 corridor linking Texas and California. VINH and DIANA reported that among the items stolen were $440,000 bulk cash and a money counter.

   *2.     January – September 2020*

19. In 2020, the PHAN MSB continued to receive bulk cash from customers in Texas and Florida. The business model evolved, however, to depositing the bulk cash into the banking system using nominee accounts, aggregating the funds in accounts controlled by the PHANs, using the funds to purchase virtual currency on platforms such as Circle Internet Financial and Coinbase, and selling the virtual currency to virtual currency exchangers located in California in return for bulk cash. After the completion of this process, the PHAN MSB delivered the bulk cash to customers in California. Ultimately, the PHAN MSB eliminated the need to physically transport bulk cash picked up from customers in Florida and Texas across the United States for delivery to customers in California.

20. Through their purchase and sale of virtual currency, VINH and DIANA may be operating as an Unregistered Peer-to-Peer (P2P) Exchanger. Per FinCEN, P2P Exchangers that function as Money Services Businesses (MSBs) are required to comply with the Bank Secrecy Act.

21. In February 2020, DIANA sent an encrypted chat to one virtual currency exchanger in California that the PHAN MSB used on a regular basis. DIANA explained that a courier who had picked up bulk cash from the virtual currency exchanger on behalf of the PHANs had stolen the money and was no longer to be given bulk cash meant for the PHANs. DIANA told the virtual currency exchanger not to "say anything" because the courier who stole the money "knows I sale [sic] coin without license."

### 3. September 2020 – April 2021

22. In approximately September 2020, the PHAN MSB stopped selling digital currency to the virtual currency exchangers previously identified in California. Although it is unclear how the PHAN MSB has transmitted to end customers the bulk cash taken in after September 2020, the PHAN MSB has continued to engage in money transmitting activities.

### B. PHAN MSB's Use of Co-Conspirators and Nominees

23. From late 2019 through 2021, VINH and DIANA employed multiple co-conspirators to conduct many of the day-to-day operations of the PHAN MSB. The actions taken by these co-conspirators at the direction of VINH and/or DIANA include:

  a. Establishing business entities.

  b. Opening bank accounts.

  c. Picking up bulk cash from customers in Florida and/or Texas.

  d. Picking up bulk cash from the PHANs.

  e. Depositing bulk cash into bank accounts in the names of PHAN MSB members.

  f. Purchasing cashier's checks at banks using bulk cash and depositing these cashier's checks into bank accounts in the names of PHAN MSB members.

  g. Allowing other PHAN MSB members to deposit bulk cash or cashier's checks into the co-conspirator's bank accounts.

  h. Lying to banks about the source and nature of the bulk cash used for cash deposits or the purchase of cashier's checks.

  i. Wiring funds between accounts used by the PHAN MSB.

  j. Opening accounts with virtual currency exchangers and purchasing

virtual currency.

k. Allowing VINH and/or DIANA to log-in to and conduct transactions in the co-conspirator's financial accounts.

l. Delivering bulk cash to customers in California.

24. I am aware that VINH and DIANA directed the above actions taken by co-conspirators due to my review of encrypted group chats on platforms such as WhatsApp, Signal, Telegram, Viber, and Zalo. In separate group chats set up with different co-conspirators, VINH and/or DIANA would give explicit instructions as to what each co-conspirator needed to do. For example, VINH and/or DIANA would instruct how much bulk cash the co-conspirator should deposit into what bank account. Once the instruction was followed, confirmation of the transaction would be sent to VINH and/or DIANA over the group chat in the form of a photograph of a cash deposit slip or cashier's check receipt.

25. In these group chats, VINH and DIANA sometimes referred to bulk cash using code words such as relumins, crabs, coins, cases, and raisins.

26. In addition to the explicit instructions described above, VINH also provided general guidance to several co-conspirators by texting a PDF document with the title "Banking Guidelines" in March 2020. This document explained different options for introducing bulk cash into the banking system, such as depositing bulk cash directly or purchasing a cashier's check with bulk cash and then depositing the cashier's check. At the bottom of the document, in underlined text, was written: "Note: Never deposit cash into my accounts unless otherwise instructed." The document also gave the following suspicious instruction regarding inter-account transfers: "The amount to be transferred out should look like a calculated number and should not contain many zeros. A rule of thumb is to deduct the larger amount of either $2 or the transfer fee."

27. At least 15 co-conspirators have been identified in the course of the investigation. According to more than 400 CTRs filed between January 2020 and March 2021, VINH, DIANA, and their co-conspirators conducted over $27 million in cash transactions: most commonly, cash deposits or the purchase of cashier's checks.

28. As reflected in conversations that occurred over encrypted chat and a photograph of a spreadsheet found in VINH's and DIANA's iCloud accounts, the PHAN MSB calculated "fees" owed to each co-conspirator that appear to be a percentage of the funds picked up, deposited, or transferred by that co-conspirator.

29. VINH and DIANA paid these "fees" by writing checks on American First National Bank account x3677, held in the name of VDNP Financial Tech LLC. I am aware from my review of the bank records for AFNB account x3677 that NGUYEN received at least $64,264.34 in fees in 2020.

### C. MSB Registrant Search Results

30. VINH and DIANA have registered three LLCs with the state of Texas: Reservoir Expert, LLC[2]; ResXP LLC[3], and VDNP Financial Tech, LLC[4]. They maintain and use financial accounts in the names of all three LLCs.

31. Your affiant conducted an MSB Registrant search with FinCEN and the Texas Department of Banking and the following individuals and businesses are not registered as an MSB with FinCEN, they have not filed any CTRs with FinCEN, and they do not have a license to conduct MSB services with the State of Texas:

    a. VINH
    b. DIANA
    c. Reservoir Expert, LLC
    d. ResXP, LLC
    e. VDNP Financial Tech, LLC

### D. Overt Acts by VINH and DIANA on Behalf of the Conspiracy

32. In the course of the investigation, I have reviewed encrypted chats exchanged in a WhatsApp Group Chat involving VINH, DIANA, and NGUYEN. I will refer to the Group Chat below as the PHANS-NGUYEN Group Chat.

#### 1. Receiving and Storing Bulk Cash

33. As noted above, DIANA picked up or received bulk cash from Cooperator #1 in December 2019 and was intending to do so again in January 2020. VINH and DIANA also picked up bulk cash from an unidentified customer in Pensacola, Florida, in March 2020. Additionally, NGUYEN and other co-conspirators have picked up bulk cash from VINH and DIANA at their residence in Houston.

#### 2. Directing Activities and Transactions of Co-Conspirators

34. VINH and DIANA managed the day-to-day activities of the PHAN MSB, including activities undertaken by co-conspirators. I am aware from my review of encrypted chats that VINH and DIANA have directed co-conspirators to pick up bulk cash from customers or from the PHANs, and they have directed co-conspirators to conduct specific financial transactions using bulk cash or funds derived from bulk cash given to the PHAN MSB.

---

[2] Reservoir Expert, LLC, was registered April 25, 2017.

[3] ResXP, LLC, was registered on September 7, 2017.

[4] VDNP Financial Tech, LLP, was registered on March 11, 2020.

### F. Overt Acts by NGUYEN

#### 1. Establishing Entity and Opening Accounts for Use by Phan MSB

35. On March 10, 2020, NGUYEN registered NNDP Enterprise, LLC, with the state of Texas.

36. On March 14, 2020 in the PHANS-NGUYEN Group Chat, VINH texted "you got your entity NNDP Enterprise created" and "now you need to open business accts". On March 15, 2020 VINH texted "Banks to open business accts: BoA, Chase, Wellsfargo, BBVA, AFNB, Comerica" to which NGUYEN responded "Ok". VINH then texted "These banks have branches in Dallas and Arlington" followed by "BoA, Wellsfargo, and BBVA present in Pensacola, FL" and a few minutes later texted "And regions bank presents in Dallas, Houston, Pensacola".

37. I know NGUYEN opened business bank accounts in the name of NNDP Enterprises, LLC, at Comerica, BBVA, American First National Bank (AFNB), and J.P. Morgan Chase in the days immediately following these texts. NGUYEN reported "cosmetics wholesale" as the business type on the signature cards.

#### 2. Picking Up Bulk Cash and Conducting Cash Transactions

38. At the PHANs' direction, NGUYEN picked up bulk cash directly from customers of the PHAN MSB. NGUYEN also picked up bulk cash from the PHAN residence in Houston. Following these pick-ups, also at the PHANs' directions, NGUYEN introduced the bulk cash into the banking system by cash deposits or the deposits of cashier's checks purchased with cash. NGUYEN conducted these cash transactions herself or managed cash transactions conducted by others.

39. Based on a review of text messages in the PHANS-NGUYEN Group Chat, agents found the PHANs directed NGUYEN to pick up bulk cash on multiple occasions in amounts ranging from $164,000 to $402,000 between October 2019 and June 2020.

#### 3. Recruiting and Managing Other Co-Conspirators

40. Based on my review of encrypted chats over the PHANS-NGUYEN Group Chat, I am aware that NGUYEN has managed other individuals who have conducted transactions on behalf of the PHAN MSB. For example, NGUYEN has texted to the PHANS-NGUYEN Group Chat photographs of deposit slips and cashier's checks receipts which depict transactions conducted by these other individuals. On at least one occasion, the PHANs asked NGUYEN to confirm the identity of someone who conducted a cash transaction on behalf of the PHAN MSB.

### G. Search Warrant of PHAN Residence

41. On April 21, 2021, a federal search warrant was executed at the PHANs' residence in Houston, Texas.

42. During the search of the PHAN PREMISES, law enforcement seized a money counter, ballistic vests, computers, cell phones, currency, and documentary evidence related to their Unlicensed MSB, such as deposit receipts and ledgers.

### H. Interview of NGUYEN

43. On April 21, 2021, a federal search warrant was executed at NGUYEN's residence in Arlington, Texas. During the search, law enforcement interviewed NGUYEN.

44. NGUYEN stated that she picked up and received large amounts of cash at the direction of VINH and DIANA, who NGUYEN knows as "Diem". NGUYEN stated that she has done so on approximately fifty occasions. NGUYEN said the cash was often wrapped with rubber bands and on occasion wrapped in plastic.

45. NGUYEN said she was paid based on the amount of bulk cash that she picked up or received.

46. NGUYEN said she picked up cash at multiple residences in the Dallas area and that individuals delivered bulk cash to NGUYEN at her residence in Arlington. NGUYEN said that the most recently delivery was a couple of weeks ago, in the amount of approximately $100,000.

47. NGUYEN said she was instructed by the PHANs not to ask about the source of the cash. NGUYEN said she believed the cash was probably from drugs and smelled like marijuana.

48. Approximately one year ago, the PHANs directed NGUYEN to pick up bulk cash and deliver the cash to a car dealership in the Dallas area for the purchase of a Rolls Royce. NGUYEN said she delivered $100,000 in bulk cash as payment and then shortly after delivered $200,000 in bulk cash to the dealership. NGUYEN said the vehicle was purchased in someone else's name.

49. NGUYEN said she has traveled to California and to Florida to pick up cash for the PHANs. NGUYEN stated that she picked up bulk cash from the PHANs at their residence and from at least one other individual in Houston, Texas, at the direction of the PHANs.

50. NGUYEN showed agents encrypted messages from the PHANs from November 2020 to April 2021 regarding the delivery of bulk cash to her and transactions conducted after receiving the bulk cash.

51. NGUYEN said the PHANs provided instructions to NGUYEN to purchase cashier's checks with cash at various banks and deposit the cashier's checks. NGUYEN stated she has recruited and paid several identified individuals to assist her by purchasing cashier's checks with cash. NGUYEN paid the other individuals approximately half of what she was paid by the PHANs to conduct transactions.

52. NGUYEN stated the PHANs instructed her to tell the banks that she was a sales representative if asked about the source of the cash.

53. NGUYEN also received addresses and instructions from the PHANs to provide to other individuals. NGUYEN stated that the PHANs did not want to communicate directly with these individuals. NGUYEN showed agents an address in California that the PHANs sent to NGUYEN and asked her to provide to another individual.

54. NGUYEN deposited most of the cashier's checks she purchased with cash but also

mailed some of the cashier's checks to Washington state at the direction of the PHANs.

55. NGUYEN stated that the PHANs directed her to open multiple bank accounts. NGUYEN said the PHANs use her TD Ameritrade account and she has no access to the account.

I. **Interview of Co-Conspirator #1**

56. On April 21, 2021, a federal search warrant was executed at the residence of Co-Conspirator #1. During the search, law enforcement interviewed Co-Conspirator #1.

57. Co-Conspirator #1 stated that the PHANs used codes in text messages to describe cash, and the PHANs asked Co-Conspirator #1 to pick up cash from the PHANs' residence.

58. Co-Conspirator #1 stated that she saw a money counter at the PHANs' residence and that, after she picked up cash, there was still a lot of cash located inside the PHANs' residence.

59. Co-Conspirator #1 stated that the PHANS asked her to travel with them to Pensacola, Florida in 2020. While in Pensacola, the PHANS picked up money from someone, and the PHANS asked Co-Conspirator #1 to deposit some of the cash into bank accounts. I am aware from my records that these deposits occurred on March 17, 2020.

60. Co-Conspirator #1 stated that she opened virtual currency accounts for the PHANs, which they controlled. She stated that the PHANs paid her based on the amount of the transactions she conducted for the PHANs.

I. **Interview of Co-Conspirator #2**

61. On April 21, 2021, a federal search warrant was executed at the residence of Co-Conspirator #2. During the search, law enforcement interviewed Co-Conspirator #2.

62. Co-Conspirator #2 stated that in approximately March 2020, he met with the PHANs at their residence to discuss joining them in a partnership. According to Co-Conspirator #2, the PHANs described the venture as an import and export business.

63. Co-Conspirator #2 stated that the PHANs instructed him to pick up cash from the PHAN residence, which Co-Conspirator #2 agreed to do for them. On multiple occasions, Co-Conspirator #2 picked up cash from the PHAN residence and deposited the cash into banks or purchased cashier's checks.

64. Co-Conspirator #2 stated that the PHANs asked him to open a virtual currency account with Circle Internet Financial, and that he opened this account per their instructions.

65. Co-Conspirator #2 stated that VINH opened a Coinbase account in Co-Conspirator #2's name.

66. Co-Conspirator #2 stated that the PHANs paid him with checks to conduct financial transactions for the Phans.

67. Co-conspirator #2 stated that he last spoke to VINH in December 2020 and has not spoken to either VINH or DIANA since that time.

## CONCLUSION

68. Based on the foregoing, I believe there is probable cause to believe that between on or about December 1, 2019, and on or about April 21, 2021, VINH Quang Le, DIANA Le Phan, and Nhiem Thi Dan NGUYEN conspired to violate 18 U.S.C. § 1960 (Unlicensed Money Transmitting Business), in violation of 18 U.S.C. § 371.

Respectfully submitted,

Luis Reyna
Special Agent

Subscribed to and sworn telephonically to on this 21st day of April, 2021, and I find that there is probable cause.

Hon. Peter Bray
United States Magistrate Judge